NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1311

BOSS INDUSTRIES, INC.,

Plaintiff/Counterclaim Defendant-Appellant,

and

JAMES ATHERLEY,

Counterclaim Defendant-Appellant,

v.

YAMAHA MOTOR CORPORATION, U.S.A., INC.,

Defendant/Counterclaimant-Appellee.

Alan M. Anderson, Briggs & Morgan, PA, of Minneapolis, Minnesota, argued for plaintiff/counterclaimant defendant-appellant and counterclaim defendant-appellant. With him on the brief was Christopher A. Young.

Robert C. Weiss, Jones Day, of Los Angeles, California, argued for defendant/counterclaimant-appellee. With him on the brief was Anna E. Rainer.

Appealed from: United States District Court for the District of Utah

Judge Dale A. Kimball

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1311

BOSS INDUSTRIES, INC.,

Plaintiff/Counterclaim Defendant-
Appellant,

and

JAMES ATHERLEY,

Counterclaim Defendant-Appellant,

v.

YAMAHA MOTOR CORPORATION, U.S.A., INC.,

Defendant/Counterclaimant-Appellee.

Appeal from the United States District Court for the District of Utah in case
no. 2:05-CV-00422, Judge Dale A. Kimball.

_____

DECIDED: May 28, 2009

_____

Before NEWMAN, SCHALL, and GAJARSA, <u>Circuit Judges</u>.

SCHALL, <u>Circuit Judge</u>.

## DECISION

This is a patent infringement case. Boss Industries, Inc. and James Atherley[1]

(together "Boss"), appeal the final judgment of the United States District Court for the

---

[1]    James Atherley is the inventor of the patents-in-suit and granted Boss a sole
and exclusive license to all rights in the patents-in-suit.

District of Utah, holding that Yamaha Motor Corp., U.S.A., Inc. ("Yamaha") did not infringe numerous claims of Boss's U.S. Patent Nos. 6,086,149 ("the '149 patent"), 6,386,630 ("the '630 patent"), and 6,585,317 ("the '317 patent"). In particular, Boss appeals the district court's claim construction of several terms in the claims asserted against Yamaha. Boss Indus., Inc. v. Yamaha Motor Corp., U.S.A., No. 2:05CV00422 (D. Utah Sept. 7, 2007) ("Claim Construction"). Based on the court's Claim Construction, Boss conceded that it could not prove Yamaha infringed the asserted claims as construed and therefore stipulated to noninfringement. Accordingly, the district court entered judgment of noninfringement in favor of Yamaha and simultaneously dismissed all of Yamaha's counterclaims. Boss Indus., Inc. v. Yamaha Motor Corp., U.S.A., No. 2:05CV00422 (D. Utah Mar. 13, 2008) ("Judgment"). In addition, Boss appeals the district court's denial of two discovery motions related to Yamaha's invalidity counterclaims. Because the district court's construction of the dispositive claim terms is correct and because Boss has stipulated to noninfringement under the district court's constructions, we affirm.

DISCUSSION

I.

Boss is the owner of the '149, the '630, and the '317 patents. All three patents share nearly identical disclosures and issued from related applications in a patent family, including a "parent" patent and three "child" continuations-in-part patents. All three patents-in-suit are continuations-in-part from parent U.S. Patent No. 5,944,380

("the '380 patent").[2]  Additionally, the '630 patent is a continuation-in-part of the '149 patent, while the '317 patent is a continuation-in-part of both the '149 and '630 patents.

All three patents-in-suit are identically titled and directed to a "Light-Weight Snowmobile Seat." '149 patent, '630 patent, '317 patent.  This light-weight snowmobile seat contains a "rigid base section for mounting on a snowmobile."  See, e.g., '149 patent Abstract.  In reference to figure 4 below, the "base section" **40** of the snowmobile seat **10** is a "closed-cell structure" and is "substantially rigid and provides support for the seat."  Id. col.4 ll.20-22.  According to the patents, "[t]he closed-cell base section **40** is a significant improvement over prior art seats utilizing metal or plastic frames and open cell foam cushioning because the closed-cell structure forms a substantially rigid base without adding weight or absorbing water."  See, e.g., id. col.4 ll.34-39.  A flexible seat section **60** is placed in an indentation **54** on the upper surface **52** of the base section **40**.  Id. col.4 l.60-col.5 l.1.  "The upper surface **52** of the base section **40** may also form part of the upper surface **20** of the seat **10**."  Id. col.4 ll.64-65.  The snowmobile rider sits on the upper surface of the seat section **62** or the upper surface of the base section **52**, if the base section's upper surface is exposed.  Id. col.5 ll.1-10.

---

[2]  Boss did not assert the '380 patent against Yamaha.



**Fig. 4**

<u>See</u> '149, '630, '317 patents fig.4.

In further detail, "[t]he base section **40** has a lower surface **42** that forms at least part of the bottom **22**" of the snowmobile seat. '149 patent col.4 ll.44-45. The bottom **22** is disposed on the snowmobile, which is generally indicated at **23**. <u>Id.</u> col.4 ll.8-10. The bottom of the base section **40** also forms cavities, for example cavity **46**, "so that seat **10** fits around various snowmobile components, such as a gas tank, an engine, a battery, etc." <u>Id.</u> col.4 ll.58-60. The base section **40** is attached to the top of the snowmobile **23**—for example, using fasteners with one portion **93** located on the snowmobile and the other portion **91** located on the lower surface **42** of the base section **40**, which contacts the snowmobile. <u>Id.</u> col.5 ll.54-65.

Claim 1 of the '149 patent is representative of the claims on appeal:

1. A snowmobile seat comprising:

a generally rigid base section having a lower surface for mounting on a snowmobile and an upper surface;

a flexible seat section disposed on the base section and having an upper surface on which a rider may sit and a lower surface, the flexible seat section being formed of a compressible, open-cell material which compresses and deflects under force;

a space disposed between the lower surface of the rigid base section and the upper surface of the flexible seat section and defining an air chamber, the space being formed at least partially by the flexible seat section;

cover means for covering at least a portion of the base and seat sections; and

at least one air passage extending from the air chamber;

the flexible seat section deflecting between (i) a first position in which the seat section is substantially undeflected and defines the air chamber, and (ii) a second position in which the seat section deflects into the air chamber forcing air from the air chamber and through the at least one air passage.

'149 patent col.9 l.53-col.10 l.6.

II.

Yamaha sells a variety of snowmobiles and snowmobile seats. On May 12, 2005, Boss filed a patent infringement suit against Yamaha in the United States District Court for the District of Utah, alleging that Yamaha's "Viper" seats infringe claims 1-3, 6, 8, 20, and 21 of the '149 Patent; claims 19, 21, and 23 of the '630 Patent; and claims 5, 7, 8, 12, 13, 16, and 18 of the '317 Patent. Boss also alleged that Yamaha's "Apex" seats infringe claim 21 of the '630 Patent, and claims 12 and 13 of the '317 Patent.[3] On

---

[3] The record does not clearly reflect which claims the Apex seats allegedly infringe. Although the district court's judgment states that the Apex seats are accused of infringing only claim 21 of the '630 patent and claims 12 and 13 of the '317 patent, see Judgment, slip op. at 2, Boss indicated in its post-claim construction status report to the district court that claims 16 and 18 of the '317 patent were asserted as well. Neither party addresses this discrepancy in their briefing. Regardless, claims 16 and 18

July 7, 2005, Yamaha answered, asserting numerous counterclaims including that the patents-in-suit were not infringed, and were invalid and unenforceable.

Following extensive briefing and a <u>Markman</u> hearing on June 14, 2007, the district court issued a detailed claim construction order on September 7, 2007. <u>See Claim Construction</u>. In its order, the court construed fifteen disputed claim limitations. <u>See</u> <u>id.</u> While the constructions of the majority of these limitations have been appealed, the constructions of two limitations are particularly important. These limitations are "base" or "base section,"[4] and "adjacent."

The term "base section" appears in all three patents-in-suit and in all of the asserted claims, except for claim 5 of the '317 patent. The term "adjacent" appears in claims 5, 7, and 8 of the '317 patent. After a detailed review of the claim language, the patents' specifications, and the prosecution histories, the court construed "base section" for all three patents-in-suit as "the bottom support structure of the snowmobile seat." <u>Claim Construction</u>, slip op. at 20. Following a similar detailed analysis, the court construed "adjacent" as "next to or adjoining." <u>Id.</u> at 32.

After the court issued its <u>Claim Construction</u>, Boss filed a post-claim construction status report, stating that "[a]s a result of the court's claim construction, the court should rule as a matter of law that Yamaha's accused snowmobile seats do not infringe any of

---

of the '317 patent both contain the limitation "base section," which, as explained below, Boss concedes is missing from the accused Apex seats as currently construed. Thus, because we affirm the district court's construction of "base section," we consequently find that claims 16 and 18 of the '317 patent cannot be infringed.

[4] The terms "base section" and "base" are used interchangeably in the patents-in-suit and neither party has differentiated between the terms. In addition, the district court treated the terms as the same during claim construction. <u>See</u> <u>Claim Construction</u>, slip op. at 12. As such, we will treat the terms "base section" and "base" the same on appeal and will refer to both collectively as "base section."

the asserted claims of the Boss Patents." Boss then requested the court to enter summary judgment of noninfringement of all its asserted claims. Additionally, Boss listed each of the limitations as construed that were missing from the accused products, specifically indicating that either "base section" or "adjacent" were missing from all of the asserted claims. Accordingly, the district court "enter[ed] judgment of non-infringement, both literally and under the doctrine of equivalents, in favor of Yamaha on all claims in Boss's Amended Complaint." Judgment, slip op. at 2-3. The court also dismissed Yamaha's counterclaims. Id. at 3.

In addition to claim construction, the district court also addressed issues that Boss raised concerning Yamaha's alleged discovery abuses. Because of Yamaha's alleged discovery misconduct, Boss filed a first motion ("Motion to Preclude"), urging the court to preclude certain witness testimony and evidence, which, according to Boss, Yamaha belatedly produced. Boss filed a second motion ("Adverse Inference Motion") that was based on Yamaha's alleged failure to "institute a litigation hold after being served with Boss's Complaint." Boss argued that Yamaha's failure to issue a litigation hold caused the destruction of relevant documents, prevented Boss from obtaining vital information, and therefore warranted an adverse inference instruction.

On January 22, 2007, the district court denied Boss's Motion to Preclude "[f]or the reasons stated by Yamaha in its response to Plaintiff's motion." Boss Indus., Inc. v. Yamaha Motor Corp., U.S.A., No. 2:05CV00422, slip op. at 3 (D. Utah Jan. 22, 2007). The court gave no further explanation. Id. Because it was unclear why the court denied Boss's previous Motion to Preclude, Boss requested reconsideration, or clarification, of the court's denial.

On March 13, 2008, in the Judgment, the court denied both Boss's Adverse Inference Motion and its motion for reconsideration, or for clarification, of the court's previous denial of its Motion to Preclude. Judgment, slip op. at 3. The court did not provide an explanation. Rather, it stated that "upon review and consideration of the memoranda and other materials submitted therewith, the Court denies both motions on the merits."

### III.

Boss appeals the district court's claim construction and the district court's denial of its two discovery-related motions. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(1). Boss acknowledged, in its post-claim construction status report to the district court and in its briefing to this court, that all of the accused products do not contain either the "base section" or "adjacent" limitations under the district court's construction. As such, because of Boss's concessions and because infringement requires each claim limitation to be satisfied, see BMC Res., Inc. v. Paymentech, L.P., 498 F.3d 1373, 1378 (Fed. Cir. 2007) ("Direct infringement requires a party to perform each and every step or element of a claimed method or product."), if we find that the district court correctly construed both of the limitations "base section" and "adjacent," we must affirm the judgment of noninfringement in favor of Yamaha. Because "base section" and "adjacent" are dispositive if we affirm the district court's construction, we address those limitations first.

Claim construction is a question of law that we review de novo. Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). The words of a claim "'are generally given their ordinary and customary meaning,'" according to a person of

ordinary skill in the art at the time of the invention. Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The claims themselves provide "substantial" guidance as to the meaning of claim terms. Id. at 1314. However, the claims must be read in light of the specification, the "'single best guide to the meaning of a disputed term.'" Id. at 1315 (quoting Vitronics, 90 F.3d at 1582).

## A.

We first turn to the "base section" limitation, which appears in all but one of the asserted claims. More particularly, "base section" is found in claims 1-3, 6, 8, 20, and 21 of the '149 patent; claims 19, 21, and 23 of the '630 patent; and claims 7, 8, 12, 13, 16, and 18 of the '317 patent. As noted, the district court construed this limitation to have a single meaning for all three of the patents-in-suit: "the bottom support structure of the snowmobile seat." Claim Construction, slip op. at 20.

According to Boss, notwithstanding the fact that the patents' specifications are nearly identical, each patent should have a different construction for the term "base section":

> The '149 Patent: "a cellular structure that forms at least part of the bottom of the seat."

> The '630 Patent: "a cellular structure that forms at least part of the bottom of the seat and which can be directly or indirectly mounted to the snowmobile."

> The '317 Patent: "a cellular structure that forms at least a part of the bottom of the seat and which can be mounted to other support structure that in turn can be mounted to the snowmobile."

Boss argues that the district court erred by construing "base section" identically for all three patents because "the specifications of the Boss Patents successively broaden the

2008-1311                                9

scope of 'base section.'" Specifically, Boss highlights that each patent has a slightly different disclosure—including several unique sections in the '630 and '317 patents that do not appear the other patents—to support its contention that "base section" should be construed differently for each patent. Also, Boss argues that the district court incorrectly limited "base section" to the preferred embodiments.

Yamaha counters that the district court's construction of "base section" is supported by the all three patents' claims and specifications. In addition, Yamaha points out that both the preferred and alternative embodiments indicate that the "base section" is the bottom structure that provides support. Moreover, Yamaha argues that Boss's proposed constructions import unnecessary limitations into the claims and misinterpret the patents' specifications.

We hold that the district court correctly construed "base section" as the "bottom support structure of the snowmobile seat." Contrary to Boss's arguments, the district court's construction—"bottom support structure of the snowmobile seat"—does not improperly limit "base section" to a preferred embodiment. Rather, it is in accordance with the entirety of each patents' intrinsic evidence. See, e.g., Phillips, 415 F.3d at 1314-15 (emphasizing a patent's intrinsic evidence as particularly important to claim construction); Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1370-71 (Fed. Cir. 2003) (looking to "whether the specification read as a whole suggests that the very character of the invention requires" a particular claim construction). In addition, because each patent-in-suit is derived from the same parent application and shares many common terms with its sister patents, the district court correctly interpreted "base section" consistently across all of the asserted patents. See NTP, Inc. v. Research In Motion,

Ltd., 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because NTP's patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."); Jonsson v. Stanley Works, 903 F.2d 812, 818 (Fed. Cir. 1990) ("The '912 patent is the result of a continuation-in-part application from the original '008 application, which led to the '251 patent. Hence . . . the construction of the term 'diffuse light' contained in that patent, is relevant to an understanding of 'diffuse light' as that term is used in the '912 patent.").

We begin by looking at the claim language itself, which is instructive of the proper construction of "base section." See Phillips, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). Several claims at issue in each patent indicate that the "base section" has a "lower surface for mounting on a snowmobile" and that "a flexible seat section [is] disposed on the base section . . . on which a rider may sit." '149 patent col.9 ll.53-57; col.12 ll.31-38; see '317 patent col.10 ll.65-67; col.11 ll.19-25 (claiming that the flexible seat section, upon which the rider sits, is placed on top of the base section); '630 patent col.11 ll.41-44 (claiming that a flexible seat section is disposed on a generally rigid base section); col.12 ll.18-23 (claiming "a substantially rigid base section, supporting the flexible seat section," upon which a rider may sit). Other claims similarly state that the base section "has a bottom surface configured to abut an upper surface of the track tunnel of the snowmobile" and that "the rigid base section provides a desired shape and structure of the seat." '317 patent col.11 ll.25-29; col.12 ll.10-13, 42-46. In addition, certain unasserted claims likewise suggest that the "base section" must be the bottom structure of the seat. See, e.g., Phillips, 415 F.3d at 1314 ("unasserted [claims] can also be valuable sources of

enlightenment"). For example, several such claims indicate that the "base section" includes "fasteners" to couple the seat to the body of the snowmobile. See, e.g., '317 patent col.10 ll.28-61 ("fasteners being coupled on the lower surface of the base section and configured to be coupled to the snowmobile to resist horizontal movement between the base section and the snowmobile"); '630 patent col.20 ll.5-16 ("fasteners, configured to be coupled between the base section and the snowmobile" to resist movement between the base section and the snowmobile); '149 patent col.10 ll.30-35 ("fasteners being coupled on the lower surface of the base section and configured to be coupled to the snowmobile"). The fact that the base section abuts, mounts, and fastens to the upper portion of the snowmobile body indicates that it must be the bottom of the snowmobile seat. Indeed, it would be difficult, if not impossible, to mount the base section to the top of the snowmobile, using the fasteners on the base section's bottom, if the base section was not the bottom of the snowmobile seat. Similarly, that the base section is placed underneath the flexible seat section and that it provides the shape of the snowmobile seat, certainly denotes that the base section provides support for the snowmobile seat upon which the rider sits.

While the claims provide guidance, the district court's construction of "base section" is further confirmed, and consistently explained in detail, by each patents' specification. See Phillips, 415 F.3d at 1315 (acknowledging that the specification is "always highly relevant" and usually dispositive). The patents' specifications emphasize exactly what was described in the claims—that the base section has a bottom surface that is disposed on, and abuts, the snowmobile body and an upper surface for placing a flexible seat section upon which the rider may sit. See '149 patent col.2 ll.40-45; col.4

ll.8-13; col.6 ll.33-34; see also '630 patent col.3 ll.35-36 ("The front **24**, like the bottom **22**, abuts the snowmobile **23**."); col.4 ll.25-26 ("The seat section **60** has an upper surface **62** on which a rider may sit."); col.6 ll.3-4 ("bottom **222** disposed on the snowmobile **23**"); '317 patent col.2 ll.1-3 ("a substantially rigid base disposed over an upper surface of a track tunnel of a snowmobile."), ll.15-17 ("the base section or bottom thereof can abut directly to the upper surface of the track tunnel of the snowmobile."); col.3 ll.55-58 (same).  Again reiterating the claim language, each specification explains that the bottom surface of the base section includes fasteners, hooks, or rails for coupling the base section to the body of the snowmobile.  See, e.g., '149 patent col.2 l.65-col.3 l.25 ("fasteners are coupled on the lower surface of the base section and coupled to the snowmobile to resist horizontal movement"); col.5 ll.54-65; col.8 ll.53-58; '630 patent col.2 ll.13-27; col.5 ll.11-35; col.8 ll.8-45; '317 patent col.6 ll.5-20. Moreover, the same point is reflected in all the figures in each patent.  For example, figure 4 of each patent discloses joining the snowmobile seat to the snowmobile body using a pair of fasteners—one fastener **91** located on the lower surface of the base section and the other fastener **90** located on the upper surface of the snowmobile **23**. See, e.g., '630 patent fig.4; see also '630, '317, '140 patents fig.10 (showing a different embodiment of the snowmobile seat, but still disclosing one fastener on the on the bottom of the base section and another fastener on the top of the snowmobile body). Thus, the base section is required to be the bottom structure of the snowmobile seat.

Further emphasizing that the base section is the bottom structure of the snowmobile seat, the base section consists of formed cavities that fit around various components located on the snowmobile itself, such as the gas tank, engine, and

battery. '630 patent col.4 ll.14-16; '149 patent col.4 ll.58-60; '317 patent col.2 ll.2-32 (describing various indentations in the base section to "match" components on the snowmobile body). In this way, the base section can act as a "leak barrier between the snowmobile components . . . and the flexible seat section," which is placed on top of the base section. '317 patent col.2 ll.27-30; see, e.g., '630 patent col.3 ll.47-50 (explaining that the base section "does not absorb moisture or water"); '149 patent col.4 ll.25-28 (same). If the base section was not the bottom of the snowmobile seat, it would not need to be formed with cavities to "match" the shape of the snowmobile body and components; nor could it protect the flexible seat section from leaking snowmobile components.

The patents' specifications similarly reiterate that the base section is the support structure of the snowmobile seat. Specifically, each patents' specification states that the "base section . . . is substantially rigid and provides support for the seat []," '149 patent col.4 ll.21; col.6 ll.38-40; '630 patent col.3 ll.42-43; col.6 ll.7-9; '317 patent col.4 ll.5-7; col.7 ll.1-3, and "provide[s] strength and rigidity," '630 patent col.3 ll.47-48; '149 patent col.4 ll.24-26; '317 patent col.4 ll.20-22. The statement in the specification that the base section "prevents the seat from collapsing onto the snowmobile components" and "provide[s] the desired shape and structure of the seat," '317 patent col.2 ll.23-25; col.4 ll.24-26; col.4 l.64-col.5 l.5, further suggests that the base section is the support structure.

Boss cites several portions of the patents-in-suit, suggesting both that its proposed constructions are correct and that the district court's construction is unduly

narrow.  In emphasizing these excerpts, however, Boss attempts to read unnecessary limitations into the claims and misinterprets the specification.[5]

Arguing that the "base section" should be only "at least a part of the bottom" of the snowmobile seat, Boss stresses that each patent explains that the "base section **40** has a lower surface **42** that forms <u>at least part of the bottom **22**</u>."  See, e.g., '317 Patent col.4 ll.44-45 (emphasis added); <u>see also</u> '149 patent col.4 ll.44-45; '630 patent col.3 ll.66-67.  Boss, however, misinterprets these statements in the specifications.  Tellingly, the "at least part of the bottom **22**" of the snowmobile seat language does not describe the entire base section **40**.  Instead, as clarified in figure 4, the "at least a part of the bottom **22**" language only describes the "lower surface **42**."  In other words, the "bottom **22**" of the snowmobile seat consists of <u>at least a "lower surface **42**"</u> of the base section, but may consist of <u>another surface on the bottom of the base section</u>—i.e., a surface higher than the lower surface, but still part of the bottom of the base section.[6]  Indeed, the "lower surface **42**" forms a part of the bottom **22**, while the higher surface, indicated by **46**, forms the remaining part of the bottom **22**.[7]  Thus, the higher and lower surfaces

---

[5]    We also note that Boss' proposal to construe "base section" differently for each patent is contrary to its initial suggestion, in the district court, that the limitation should be construed identically across all three patents.

[6]    A "higher surface" should not be confused with the "upper surface" of the base section, which is exemplified by **52** and **54** in figure 4.  The "upper surface" is <u>on the top</u> of the base section, and the rider either sits directly on the "upper surface" or on a "flexible seat section" placed on the "upper surface."  See, e.g., '317 patent col.5 ll.6-23.  In contrast, the "higher surface" refers to a surface higher than lower surface, but nonetheless still <u>on the bottom</u> of the base section.  See, e.g., '317 patent fig.4.  Accordingly, both the higher and lower surfaces make up the bottom of the base section, which abuts the snowmobile body.

[7]    We recognize that the patents' specifications describe item **46** in figure 4 as "additional cavities."  See, e.g., '149 patent col.4 l.58.  We in no way contradict this disclosure, but, because the higher surface in figure 4 is not labeled, we simply use **46** as a convenient reference.

form the entire bottom of the snowmobile seat.  Logically, because both the higher and lower surfaces are part of the base section, the base section is therefore the bottom structure of the snowmobile seat.

Next, Boss cites the specification language stating that the base section, or bottom thereof, can be "directly or indirectly mounted on the snowmobile."  This suggests to Boss that the base section for all patents need only be "at least a part of the bottom" of the snowmobile seat.  See '630 patent col.3 ll.31-32; col.3 l.67-col.4 l.1; col.6 ll.19-21.  Because this statement only appears in the '630 patent, Boss also argues that its unique construction of base section in the '630 patent is correct.  This disclosure, however, does not further explain the difference between directly and indirectly mounting and does not prevent the base section from being the "bottom support structure of the snowmobile."  Rather, based on the entirety of the intrinsic evidence, including these specific statements, the base section can still be indirectly mounted to the snowmobile while being the "bottom" structure of the snowmobile seat.  Moreover, the other portions of the specifications, which more clearly discuss mounting the snowmobile seat to the snowmobile body, disclose using "hook-and-loop type fasteners" or the "snap type fasteners."  See, e.g., '630 patent col.5 ll.10-35; col.8 ll.8-61.  Not only do neither of these mounting fasteners preclude the base section from being the bottom structure, but they in fact support that the base section must be the bottom structure of the snowmobile seat.  As explained, mounting the base section to the top of the snowmobile—using the fasteners on the base section's bottom—would be difficult unless the base section was the bottom of the snowmobile seat.  As such, if the base

section is "indirectly mounted on the snowmobile" using either of these fastener-types, the base section is nonetheless the "bottom support structure of the snowmobile seat."

Boss also points out that the '317 patent states that "the base structure can be mounted to other support structure that in turn can be mounted on the track tunnel." See '317 patent col.4 ll.14-16. According to Boss, this statement both proves its different construction for the '317 patent and that, because the base section can be mounted to an additional support structure, the base section is not necessarily the bottom support structure. Boss, however, overlooks that this statement is not inconsistent with the base section being the bottom support structure of the snowmobile seat, despite being mounted to another support structure. In fact, the cited passage suggests that the "other support structure" is not part of the snowmobile seat, but rather is part of the snowmobile body or is independent from any other part. The claim construction, however, requires the base section to be the "bottom support structure of the snowmobile seat." As such, even assuming the "other support structure" provides some support to the bottom of the seat, it is neither the bottom structure nor the support structure of the snowmobile seat. Thus, the base section remains both the bottom structure and the support structure of the snowmobile seat.

For the foregoing reasons, we hold the district court correctly construed "base section" for all three patents-in-suit to mean the "bottom support structure of the snowmobile seat." We have considered Boss's additional arguments on this issue, but find them unpersuasive.

We now address the construction of "adjacent." This limitation explicitly appears only in independent claim 5 of the '317 patent, but it is also required in dependent claims 7 and 8 by dependency from claim 5. The district court construed this limitation as "next to or adjoining." Claim Construction, slip op. at 32.

Boss argues that this term should be construed as "close to." Boss contends that the district court inappropriately limited the definition of "adjacent" and, in doing so, excluded certain embodiments in the '317 patent. According to Boss, the proper construction would cover all of the disclosed embodiments. Specifically, Boss points to figures 4 and 10 in the '317 patent, emphasizing that its proposed construction—"close to"—would encompass both disclosed figures, whereas the district court's construction excludes the embodiment shown in figure 4.

Yamaha responds that the intrinsic evidence, the claims, and ordinary meaning support the district court's construction. In particular, Yamaha argues that the '317 patent's specification use of "adjacent" to describe "corners formed by adjacent sides of the base section **240**," col.9 l.52, confirms "the concept of next to or adjoining." Yamaha also contends that, contrary to Boss's suggestion, the court's construction "does not exclude any embodiments from the scope of the invention because other claims are available to cover those embodiments."

We agree with the district court that the correct construction of "adjacent" in the '317 patent is "next to or adjoining." Although the term "adjacent" is a commonly understood word, we still look to the intrinsic evidence for the proper construction. See Phillips, 415 F.3d at 1321 ("the specification is 'the single best guide to the meaning of a

disputed term'") (quoting Vitronics, 90 F.3d at 1582); id. ("[T]he "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent.").

Turning to the pertinent claim language, claim 5 states "a storage section, disposed adjacent the flexible seat section, having a storage cavity formed therein." '317 patent col.11 ll.3-4. While the language of claim 5 alone does little to clarify the parties' dispute, the figures in the specification support the proposition that the term means "next to or adjoining." As shown by figure 10, the storage section is directly "next to or adjoining"—not merely "close to"—the flexible seat section **260**. Id. fig.10. In addition, the specification's use of "adjacent"—"corners formed between adjacent sides of the base section"—supports that "next to or adjoining" is the correct construction. Id. col.9 ll.51-52. Indeed, in order for the sides of the base section to form "corners," the sides would logically have to be "next to or adjoining" each other, rather than merely "close to" each other. See id. fig.9a items 230 and 224. Moreover, this construction, gleaned from the intrinsic evidence, is consistent with the dictionary definition of "adjacent." See, e.g., American Heritage Dictionary of the English Language (4th Ed. 2000); Phillips, 415 F.3d at 1322-23 (acknowledging that a construction "may also rely on dictionary definitions . . . so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." (quoting Vitronics, 90 F.3d at 1584 n.6)).

Moreover, Boss's proposed construction of "close to" and its contentions that the current construction of "next to or adjoining" excludes certain disclosed embodiments are contradicted by the unasserted claims of the '317 patent. See Phillips, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also

be valuable sources of enlightenment as to the meaning of a claim term."); see also PSN Illinois v. Ivoclar Vivadent, Inc., 525 F.3d 1159, 1166 (Fed. Cir. 2008) ("[U]nasserted or cancelled claims may provide 'probative evidence' that an embodiment is not within the scope of an asserted claim."). Indeed, this case presents a clear example of the situation in which, although alternatively disclosed embodiments are not encompassed by the current claim construction, other unasserted claims cover those alternative embodiments. See, e.g., TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc., 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("[T]he mere fact that there is an alternative embodiment disclosed in the . . . patent that is not encompassed by [a] district court's claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence."); PSN Illinois, 525 F.3d at 1166 ("[C]ourts must recognize that disclosed embodiments may be within the scope of other allowed but unasserted claims.").

Claim 5 reads "a storage section, disposed adjacent the flexible seat section." '317 patent col.11 ll.3-4 (emphasis added). Under the current construction of "next to or adjoining," claim 5 encompasses the embodiment shown in figure 10, which discloses the storage section next to the seat section. Id. fig.10. Importantly, unasserted independent claims 1 and 12, as well as their dependent claims, omit the requirement that the storage section be "adjacent" the seat section. See, e.g., id. col.10 ll.35-36; col.12 ll.25-34. As such, the unasserted claims allow the storage section to be in a variety of locations, including simply "close to" the seat section. The unasserted claims therefore specifically encompass the other disclosed embodiments, which show the storage section "close to" a seat section. See, e.g., id. fig.4 items 60 (seat section) and

44 (utility cavity). Construing the limitation "adjacent" as "close to," as urged by Boss, in this case would render that limitation in claim 5 essentially meaningless in light of the other unasserted claims—a construction we cannot accept based on the entirety of the intrinsic evidence. <u>See, e.g.</u>, <u>Ortho-McNeil Pharma., Inc. v. Caraco Pharma. Labs., Ltd.</u>, 476 F.3d 1321, 1327-28 (Fed. Cir. 2007) (rejecting a claim construction that would have "render[ed] meaningless another claim's limitation").[8]

For the foregoing reasons, we hold the district court correctly construed "adjacent" as "next to or adjoining." We have considered Boss's additional arguments on this issue, but find them unpersuasive.

In sum, because we have affirmed the district court's constructions of "base section" and "adjacent," either of which appear in all of the asserted claims, and because Boss stipulated to noninfringement under the district court's construction, we affirm the summary judgment of noninfringement of all claims.

IV.

We now turn to Boss's appeal of the district court's decision denying its discovery-related sanctions motions. Boss does not allege that its discovery motions, and the district court's denial of those motions, affected its claim construction or infringement positions. Rather, Boss apparently acknowledges that its discovery motions concerned only potential prior art and invalidity issues. As Boss correctly acknowledged at oral argument, the discovery issues therefore only need to be addressed "if the court reverses the claim construction rulings" and would only become pertinent on remand. <u>See</u> Oral Arg. 39:00-39:20, Jan. 8, 2009, <u>available at</u>

---

[8] Also, we note that Boss originally proposed during claim construction in the district court that, if "adjacent" required construction, it should be construed as "next to."

http://oralarguments.cafc.uscourts.gov. Thus, the only remedies that Boss has requested—namely, an adverse inference and preclusion of certain evidence at trial— are contingent upon further litigation in the district court. We, however, have not reversed the district court's claim construction, but rather affirmed the court's constructions of the dispositive claim terms, and Boss has conceded noninfringement under those constructions. Consequently, we cannot remand for further litigation in the district court and the discovery-related motions therefore are moot. See, e.g., Geneva Pharm., Inc. v. GlaxoSmithKline PLC, 349 F.3d 1373, 1386 (Fed. Cir. 2003) ("Because this court affirms that the patents at issue in this case are invalid, the discovery issue is moot."); Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1380 (Fed. Cir. 1999) ("[W]e note that in view of our conclusion that the claims at issue are invalid as not enabled, the fact that the district court did not admit this evidence on the issue of infringement is essentially moot.").

Nor did Boss appeal the denial of its other sanctions motions, which requested sanctions not contingent upon remanding for further district court litigation and which possibly could have provided this court with another avenue to address discovery issues. Accordingly, we are unable to rule on, not only the district court's denial of Boss's discovery motions, but also on any other possible discovery abuses that may have occurred in the district court. That said, it appears from the record presented to us that Yamaha's discovery practices were less than commendable. For example, on several occasions Yamaha date-stamped documents to be filed with the district court using the court's time stamp, but did not actually place the document in the court's drop-box at that time. See Boss Indus., Inc. v. Yamaha Motor Corp., U.S.A., No.

2008-1311                                22

2:05CV00422, slip op. at 2 (D. Utah Feb. 28, 2007) ("Discovery Order"). Rather, Yamaha actually filed the documents, by placing them in the drop-box, several days after the "filed" stamp was placed on the documents. Id. After the district court realized that this was not an isolated incident, but happened several times, it admonished Yamaha, stating that "[t]his deceitful conduct will not be tolerated" and that this inappropriate practice "is particularly egregious when . . . the court is liberal in granting extensions of time." Id. slip op. at 2-3. The court further noted that "counsel in this case have been admonished before about the gamesmanship that has been taking place in this lawsuit." Id. slip op. at 3. In addition, regarding Yamaha's interpretation of communications with the district court, the court further characterized Yamaha's actions as "unreasonabl[e]" and "disingenuous." Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A., No. 2:05CV00422, slip op. at 4 n.2 (D. Utah Jan. 23, 2007). This type of conduct during litigation is unacceptable and reflects a lack of respect for both the opposing party and the court.

## CONCLUSION

In sum, we affirm the district court's claim constructions of "base section" and "adjacent." We therefore affirm the court's grant of summary judgment of noninfringement. Because we affirm the summary judgment of noninfringement, Boss's appeal of the denial of its discovery motions is moot.

Each party shall bear its own costs.

## AFFIRMED